IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM THOMAS FISCHER, JR.,<br><br>Defendant. | CR 25-118-BLG-SPW<br><br><br>ORDER ON MOTION TO<br>SUPPRESS |

Defendant William Thomas Fischer, Jr. ("Fischer") filed a Motion to Suppress Evidence. (Doc. 20). Fischer is charged with being a Prohibited Person in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). (Doc. 2). The charge arises from Fischer's encounter with law enforcement while parked in a parking lot on August 4, 2025. (Doc. 21-1 at 2). He seeks suppression of all physical evidence seized by officers during the encounter, arguing violations of his Fourth and Fifth Amendment rights. (Doc. 20 at 1–2). The Government opposes the Motion. (Doc. 23).

The Court held a hearing on March 26, 2026, during which Billings Police Department (BPD) Officer Edward Tanzosh testified on behalf of the Government. Based on the parties' briefing, the testimony, and the video evidence, the Court finds the material facts are not in dispute.

1

For the following reasons, the Court denies Fischer's Motion.

## I.   Background

At approximately 10:00 a.m. on August 4, 2025, Officer Tanzosh observed a red Pontiac Grand Am parked in the middle of a parking lot shared by several businesses off 24th Street West in Billings, Montana. (Doc. 21-1 at 7). The vehicle appeared out of place: it was not parked near other vehicles or in a designated parking spot, and it appeared filled with property as though someone might be living in it. (*Id.*). The vehicle was running, and its heavily tinted windows were rolled down several inches. (*Id.*). From outside the vehicle, Officer Tanzosh could see the top of a person's head, which he believed belonged to an adult white male. (*Id.*).

He attempted to run the vehicle's license plate, but the return did not come back immediately. (*Id.*). After circling the lot and assisting another individual on the property, he returned to his patrol car and saw that a wanted-person "hit" had come back on the Pontiac's registered owner. (*Id.*). The hit indicated a felony arrest warrant for the registered owner, Oriion Thompson. (*Id.*). He notified dispatch of the vehicle, its location, and the associated warrant. (*Id.*).

Officer Tanzosh testified that he ran Thompson's driver's license information and confirmed that Thompson was a white male whom he had not previously encountered. He stated that he returned to the Pontiac both to determine whether the man inside was Thompson and to investigate his suspicion that the occupant might

2

be illegally camping, given that the back seat was filled with property nearly to the ceiling. He positioned his patrol vehicle behind the Pontiac, activated his emergency lights, and exited his car. (*Id.*). He observed the driver slumped down with an unlit cigarette on his chest and a wad of cash in his left hand. (*Id.*). The vehicle remained running, in park, with the keys in the ignition. (*Id.*). He testified that he waited for additional officers before attempting to wake the driver, later identified as Fischer.

Because drivers sometimes wake, panic, and flee, Officer Tanzosh deployed spike strips in front of the Pontiac's front tires. (*Id.*). BPD Officer Cache Anderson arrived and blocked the Pontiac from the front with his vehicle, and Officer Tanzosh repositioned his vehicle behind the Pontiac. (*Id.*).

Approaching the driver's side, Officer Tanzosh stated, "I don't think it's the 2-9," referring to a BPD code for a person with a warrant. (Doc. 22, Ex. D at 3:20–32 [hereinafter Ex. D]). He testified that he still did not know who the driver was, even though Fischer appeared to recognize him. Less than a minute into the encounter, he asked Fischer, "Do you have your driver's license handy?" (*Id.* at 4:27–29). Fischer responded that he did and began placing items on the dashboard before rummaging around the driver's side floorboard, apparently searching for identification. (*Id.* at 4:29–51).

Officer Tanzosh testified that most people keep their wallet on their person, so Fischer's rummaging raised concern. Looking through the window toward the

floorboard, he saw what appeared to be a loaded Glock magazine. This observation heightened his concern for officer safety.

Officer Tanzosh drew his duty weapon, pointed it at Fischer, and ordered him to place his hands on the wheel and not move. (*Id.* at 4:52–5:00). He instructed Fischer to unlock the door and warned him not to reach for the gun on the floorboard or he would be shot by Officer Anderson. (*Id.* at 5:08–31). He then ordered Fischer to open the door and step out of the vehicle. (*Id.* at 5:31–40).

Fischer was handcuffed and patted down for weapons. (*Id.* at 5:34–7:00). Officer Tanzosh remarked to BPD Officer Eric Preble that he had not yet identified Fischer. (*Id.* at 6:17–19). Looking inside the vehicle, he saw a firearm in the center console. (*Id.* at 6:19–32).

He then approached Fischer and asked, "What's your name, dude?" (*Id.* at 6:37–39). Fischer responded with his name, spelling, and date of birth. (*Id.* at 6:39–7:00). When asked whether he was "on paper," Fischer replied, "State," and identified his probation officer. (*Id.* at 7:03–32). Officer Tanzosh remarked that he was fairly certain Fischer was not permitted to possess a firearm, and Fischer shrugged in response. (*Id.* at 7:09–16).

Dispatch then returned information on Fischer. (*Id.* at 7:41–8:40). During this time, Officer Anderson contacted state probation and attempted to reach Fischer's probation officer. (Doc. 22, Ex. E at 5:05–9:14). State probation

ultimately authorized a search. (Doc. 21-1 at 12). Officer Anderson asked Fischer for consent to search the car, and Fischer responded that he did not care if they searched it. (Ex. D at 12:19–13:03). Officers located a 9mm pistol, magazines, ammunition, two BB guns, drug paraphernalia, various pills, a small amount of methamphetamine, and marijuana. (Doc. 21-1 at 12).

## II.    Legal Standard

A defendant may challenge the admissibility of evidence before trial under Federal Rule of Criminal Procedure 12(b)(3)(C), which governs motions to suppress. Such motions typically arise under the Fourth and Fifth Amendments to the United States Constitution.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To effectuate this guarantee, the Supreme Court has long recognized that evidence "secured by means of an unlawful search and seizure" must be excluded from a federal criminal trial. *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)).

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege extends beyond the criminal trial itself and "privileges [a person] not to answer official questions put to him in any other proceeding, civil or criminal, formal or

5

informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

"[A] witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Id.* at 78. This protection applies even when the individual is already convicted, incarcerated, or on probation. *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). A statement is only admissible if it was voluntary—that is, the product of a free and deliberate choice rather than coercion, intimidation, or deception. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

When law enforcement violates a defendant's Fourth or Fifth Amendment rights, the exclusionary rule mandates that "all evidence seized as a result of the [violation] must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001). On a motion to suppress, the defendant bears the ultimate burden of proving a constitutional violation. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

## III.   Discussion

Fischer first argues that Officer Tanzosh's inquiry into whether he was "on paper" unlawfully prolonged the stop because (1) the question was unrelated to the stop's mission and (2) the officers lacked independent reasonable suspicion to

6

extend the encounter.[1]  (Doc. 21 at 19–22).  He next contends that the probation-related questioning elicited involuntary statements in violation of the Fifth Amendment.  (*Id.* at 23–27).  The Court addresses each argument in turn and concludes that the encounter remained within constitutional bounds.

### A.    Duration of the Stop

A traffic stop constitutes a seizure under the Fourth Amendment and "must be 'justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place.'"  *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)).  "When the police pull someone over for a traffic violation, the officer can obviously investigate that traffic infraction" and carry out the mission of the stop.  *United States v. Ramirez*, 98 F.4th 1141, 1143–44 (9th Cir. 2024) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).  That mission includes "ordinary inquiries incident to the . . . stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and

---

[1] Though the Court does not necessarily agree that the encounter constituted a traffic stop, both parties have framed it as such in their briefing. (*See* Doc. 21 at 14–22; Doc. 23 at 7–15). Under the principle of party presentation, the Court therefore analyzes the constitutionality of the interaction as a traffic stop. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) ("In our adversarial system of adjudication, we follow the principle of party presentation. The parties frame the issues for decision, while the court serves as neutral arbiter of matters the parties present." (internal citations and quotation marks omitted)).

inspecting the automobile's registration and proof of insurance." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (quoting *Rodriguez*, 575 U.S. at 349).

Officers may also order occupants out of the vehicle, request identification, and ask general travel questions without exceeding the stop's permissible scope. *Rodriguez*, 575 U.S. at 356 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)); *United States v. Williams*, 419 F.3d 1029, 1031 (9th Cir. 2005). These tasks share the same underlying purpose as traffic enforcement itself: "ensuring that vehicles on the road are operated safely and responsibly." *Landeros*, 913 F.3d at 868 (quoting *Rodriguez*, 575 U.S. at 349).

"Authority for the seizure ends when tasks tied to the traffic infraction are— or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. A stop becomes unlawful if an officer prolongs it after completing the traffic mission or pauses that mission to pursue unrelated investigations. *Landeros*, 913 F.3d at 866. Officers may extend a stop to investigate unrelated matters "only if [they] have reasonable suspicion of an independent offense." *Id.* at 867.

Neither the Supreme Court nor the Ninth Circuit has definitively resolved whether questions about a person's probation status fall within the mission of a traffic stop. The Supreme Court has nonetheless recognized that officer safety concerns "stem[] from the mission of the stop itself," because "[t]raffic stops are 'especially fraught with danger to police officers,' so an officer may need to take

certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)).

Relying on this principle, the Ninth Circuit has held that criminal history checks fall within the mission of the stop because knowledge of past convictions bears on officer safety. *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022). By contrast, felon registration checks do not, as they are "aimed at detecting evidence of ordinary criminal wrongdoing" and lack an officer-safety justification. *Id.* at 847–48 (quoting *Rodriguez*, 575 U.S. at 355–56).

Moreover, the Ninth Circuit has concluded that questions about a person's parole status are negligibly burdensome and reasonably related to officer safety. *Ramirez*, 98 F.4th at 1144. Because parolees have committed serious crimes to warrant imprisonment, an officer may reasonably view parole status as relevant to assessing risk. *Id.* Such questions resemble criminal history checks, which alert officers to an individual's criminal background. *Id.*; *see Hylton*, 30 F.4th at 848.

Although the Ninth Circuit has not yet decided whether questions about an individual's probation status fall within the mission of a stop, this Court has held that they do. *United States v. Malloy*, No. CR 24-145-BLG, 2025 WL 2390328, at *4 (D. Mont. Aug. 18, 2025). In *Malloy*, the Court determined asking about probationary status was part of the stop's mission and therefore a permissible inquiry.

9

*Id.* at *3–4. As with parole status, probation status bears on officer safety because probationers, by definition, have been convicted of crimes and are statistically more likely to reoffend. *United States v. Knights*, 534 U.S. 112, 119–20 (2001). Asking about probation status is therefore analogous to running a criminal history check: it alerts the officer that the individual has a prior criminal conviction and may pose an elevated risk. *Malloy*, 2025 WL 2390328, at *4.

Fischer acknowledges *Malloy* but attempts to distinguish it. He contends that the probation-status question in *Malloy* "was not central to the . . . Court's eventual finding of an illegal search," and that the officers there did not engage in the "assertive action" present in his case—namely, removing Fischer from the vehicle at gunpoint and threatening to shoot if he failed to comply. (Doc. 21 at 19).

The Court sees no distinction that warrants departing from *Malloy*. The fact that the search in *Malloy* was found unlawful on other grounds does not undermine the conclusion that the probation question itself was justified by officer safety. Nor does the fact that Fischer was removed from the vehicle at gunpoint alter the analysis. Officers reasonably directed him out of the vehicle after observing a magazine on the floorboard where he had been reaching. As in *Mimms*, 434 U.S. at 112, where a visible bulge in the defendant's jacket supported the conclusion that he might be armed and justified a pat-down, the presence of a magazine supported the officers' belief that Fischer could be armed and dangerous, thereby justifying their

10

decision to remove him from the vehicle. Once Fischer was removed and restrained, officers proceeded to identify him, which included asking whether he was "on paper." As in *Malloy*, the Court concludes that this question was lawful. It was a minimally burdensome inquiry related to officer safety. *See Ramirez*, 98 F.4th at 1144. The question did not unlawfully prolong the stop because it fell within the stop's mission.

The Court also rejects Fischer's assertion that any threat to officer safety dissipated once he was removed from the vehicle. (*See* Doc. 27 at 3). The officers still did not know who he was, and the situation remained potentially dangerous. Even when a suspect is restrained, an officer may need to assess whether the individual has a history of violence, whether additional officers are needed, and other safety-related considerations. Handcuffs reduce risk but do not eliminate it. Officer Tanzosh's question therefore remained within the mission of identifying Fischer.

Fischer further argues that the probation inquiry strayed from the mission of the stop because it "had nothing to do with the safe operation of the vehicle." (Doc. 21 at 20). He contends it was instead aimed at detecting criminal wrongdoing. (*Id.*). While Fischer speculates about "the sole goal of the questioning" (*id.*), the Court will not do the same. The Court evaluates the objective reasonableness of officers' actions, not their subjective motivations. In *Ramirez*, the Ninth Circuit upheld parole-status questions even when they were "a pretext to justify a search,"

explaining "that possibility does not negate that officer safety is still a legitimate rationale for asking about parole status." 98 F.4th at 1145. "[A]s in other Fourth Amendment contexts, the question is whether the officer's actions were 'objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.'" *Id.* Asking Fischer whether he was "on paper" was objectively reasonable and part of the stop's mission regardless of any subjective intent.

The Court therefore finds that law enforcement did not unconstitutionally prolong the stop and that the evidence obtained during the subsequent search was lawfully acquired.[2]

B.     *Independent Reasonable Suspicion*

A traffic stop may be prolonged beyond its initial mission only if officers develop reasonable suspicion that the driver has committed an independent offense. *United States v. Steinman*, 130 F.4th 693, 704 (9th Cir. 2025). "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Landeros*, 913 F.3d at 868 (internal quotation marks omitted) (emphasis in original).

---

[2] Fischer does not dispute the validity of the search as a probationary search or as a consent search, apart from arguing that it was the direct result of the question about whether he was "on paper." (*See* Doc. 21 at 22). The Court therefore does not separately analyze the search's validity.

This Court has held that calling a defendant's probation officer falls outside the mission of the stop because it is "a measure aimed at detecting evidence of ordinary criminal wrongdoing," not a safety-related inquiry. *Malloy*, 2025 WL 2390328, at *4 (quoting *Rodriguez*, 575 U.S. at 355–56). Like a felon registration check—which assesses compliance with state law rather than officer safety— seeking authorization for a probation search is unrelated to the traffic mission and instead concerns potential evidence gathering. *Id.*

Although the question of whether Fischer was "on paper" fell within the mission of the stop, law enforcement's subsequent call to his probation officer did not. That step extended the encounter beyond its traffic-related purpose and therefore required independent reasonable suspicion.

Here, that standard was met. Once officers observed the firearm and loaded magazine in plain view and learned that Fischer was on probation, they had sufficient cause to believe he was committing the offense of being a prohibited person in possession of a firearm and ammunition. *See United States v. Emter*, No. CR 14-89-BLG, 2015 WL 327841, at *4 (D. Mont. Jan. 23, 2015) ("[T]he fact that Emter was on probation coupled with the fact that law enforcement believed he was residing at the residence [where a gun was found] gave [officers] sufficient cause to believe that the crime of felon in possession of a firearm was being committed."). These facts provided the particularized suspicion necessary to justify prolonging the stop.

13

Accordingly, the continuation of the stop after Fischer stated he was on probation did not convert the encounter into an unlawful detention.

### C.    Voluntariness

Fischer argues that because his probation conditions required him to be truthful and cooperative with law enforcement or risk revocation, he "suffered a Fifth Amendment violation when the officers questioned him about being on paper." (Doc. 21 at 23). The Government disagrees. (Doc. 23 at 15–16).

"As a general rule, the Fifth Amendment speaks of compulsion." *United States v. Saechao*, 418 F.3d 1073, 1077 (9th Cir. 2005) (internal citation and quotation marks omitted). Ordinarily, an individual must invoke the privilege against self-incrimination; absent invocation, a statement is not considered compelled. *Id.* This rule does not apply, however, where "an individual is subjected to a practice that denies him . . . a free choice to admit, to deny, or to refuse to answer." *Id.* (internal citation and quotation marks omitted). In such circumstances, the Fifth Amendment is self-executing, and any resulting statements are deemed involuntary and inadmissible in a criminal prosecution. *Id.*

One such circumstance is the "penalty situation" described in *Murphy*, 465 U.S. at 435. In the probation context, *Murphy* held that although a state may require a probationer "to appear and discuss matters affecting his probationary status," it may not—on threat of revocation—compel answers to questions "that would

14

incriminate him in a later criminal proceeding." *Id.* Thus, if law enforcement takes the "'impermissible step' of 'requiring [a defendant] to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent,'" any incriminating statements must be suppressed. *Saechao*, 418 F.3d at 1076 (quoting *Murphy*, 465 U.S. at 436). Where a probation condition "expressly or *implicitly* penalizes the exercise of the right to remain silent, . . . answers to incriminating questions . . . are deemed compelled." *Id.* at 1081.

This Court has previously determined that the same Montana condition at issue here triggered compelled statements. In *United States v. Wallace*, 732 F. Supp. 3d 1290, 1295 (D. Mont. 2024), *appeal docketed*, No. 25-2072 (9th Cir. Mar. 31, 2025), the defendant—like Fischer—was required to "at all times be cooperative and truthful in all his communications and dealings with Probation/Parole Officers and any law enforcement agency." Officers in that case heard the defendant moving inside his residence. *Id.* When he eventually answered the door, an officer asked why it had taken so long. *Id.* The defendant responded that he knew firearms were inside the residence. *Id.*

The Court concluded that although the probation condition "d[id] not explicitly provide that [the supervisee's] conditional release would be revoked if he remained silent, it implicitly suggest[ed] as much." *Id.* at 1298. The Court further held that the officer's question placed the defendant in a penalty situation: he could

either admit to conduct that constituted a new crime or remain silent and risk revocation. *Id.* at 1298–99. His statement was therefore involuntarily compelled. *Id.* at 1299.

By contrast, Fischer's admission that he was on probation was not compelled. Asking whether he was "on paper" did not create a penalty situation. *See United States v. Ballard*, Nos. 05-cr-00168-JCC, 06-cr-00283-JCC, 2008 WL 214797, at *6 (E.D. Cal. Jan. 24, 2008). Unlike in *Wallace*, Fischer's truthful answer would not clearly have subjected him to revocation or other penalties. *See id.* at *6; *cf. Saechao*, 418 F.3d at 1075 (defendant admitted possessing a rifle despite being a felon). The question did not force Fischer to choose between incriminating himself in new criminal conduct and risking his conditional liberty. His "yes" was not an incriminating statement, because probation status is not confidential and revealing it does not by itself carry negative consequences. Although his probationary status was relevant in the later prohibited-person-in-possession charge, the question itself did not compel an admission of wrongdoing. Dispatch can obtain this information independently, and Officer Tanzosh testified that he relayed Fischer's status to dispatch for verification.

This reasoning aligns with the Court's determination that asking whether a defendant is "on paper" is justified by officer-safety concerns. It would be inconsistent to hold that asking such a question is permissible as a safety-related

16

inquiry while simultaneously concluding that it automatically creates an involuntary penalty situation under Montana's probation conditions. Regardless of any subjective motives the officers may have had, the question is objectively reasonable as a means of assessing risk, not eliciting evidence of criminal activity.

Fischer's statement regarding his probationary status—and the evidence subsequently obtained—will therefore not be suppressed.

## IV.    Conclusion

IT IS HEREBY ORDERED that Defendant William Thomas Fischer, Jr.'s Motion to Suppress (Doc. 20) is DENIED.

DATED this ___7th___ day of April, 2026.

SUSAN P. WATTERS
United States District Judge